**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **ASPHALTOS TRADE, S.A.,**<br><br>    Plaintiff/Counter-Defendant,<br><br>v.<br><br>**BITUVEN PUERTO RICO, LLC,**<br><br>    Defendant/Counter-Plaintiff.<br><br>**BITUVEN PUERTO RICO, LLC,**<br><br>    Third-Party Plaintiff,<br><br>v.<br><br>**PUERTO RICO ASPHALT, LLC; JORGE ARTURO DIAZ MAYORAL,**<br><br>    Third-Party Defendants. | Civil No. 18-1876 (BJM) |

## OPINION & ORDER

Plaintiff Asphaltos Trade, S.A. ("Asphaltos") filed suit against Bituven Puerto Rico, LLC ("Bituven"), alleging, inter alia, that Bituven breached a contract when it sold liquid asphalt owned by Asphaltos without notifying or paying Asphaltos. Docket No. ("Dkt.") 1. Bituven filed a third-party complaint against Puerto Rico Asphalt, LLC ("PRA") and Jorge Arturo Diaz Mayoral ("Diaz"), alleging that PRA and Diaz had taken that liquid asphalt without Bituven's permission. Dkt. 12. PRA counterclaimed against Bituven for civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 and 18 U.S.C. § 1964, and Puerto Rico law. Dkt. 80 at 16-33 ("Countercl. Compl"). According to PRA, Bituven was defrauding both PRA and Asphaltos: it had sold the liquid asphalt to PRA (at a fraudulently high price) without telling Asphaltos. *Id.* Bituven moved to dismiss PRA's counterclaims, Dkt. 91, and PRA opposed, Dkt. 104. This case is before

me by consent of the parties. Dkt. 86. For the following reasons, Bituven's motion is **GRANTED IN PART** and **DENIED IN PART**.

## MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

When faced with a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court "accept[s] as true all well-pleaded facts alleged in the complaint and draws all reasonable inferences therefrom in the pleader's favor" to determine whether the complaint states a claim for which relief can be granted. *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011). The court "may augment these facts and inferences with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *Starr Surplus Lines Ins. Co. v. Mountaire Farms Inc.*, 920 F.3d 111, 114 (1st Cir. 2019) (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)) (internal quotations omitted). In undertaking this review, the court must

> first, 'isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements[,]' then 'take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.'

*Zell v. Ricci*, 957 F.3d 1, 7 (1st Cir. 2020) (alterations in original) (quoting *Zenón v. Guzmán*, 924 F.3d 611, 615–16 (1st Cir. 2019)). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job," which requires drawing on "'judicial experience and common sense.'" *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## BACKGROUND[1]

This dispute brings together various entities that sell, purchase, and/or store liquid asphalt. Of primary importance for purposes of the present motion are counterclaimant

---

[1] The following facts are drawn from PRA's counterclaim complaint. As with any 12(b)(6) motion, facts from the counterclaim complaint are taken as true and all reasonable inferences drawn in PRA's favor.

PRA and counterclaim defendant Bituven. PRA has purchased liquid asphalt from Bituven and alleges that Bituven was involved in a fraudulent scheme to overcharge PRA for that liquid asphalt. The story begins, however, not with PRA or Bituven, but with Betteroads, Asphalt LLC ("Betteroads").

Betteroads is a Puerto Rico company that owns and operates an asphalt terminal and storage tank farm located in Guayanilla, Puerto Rico. Countercl. Compl. ¶ 5. That asphalt terminal houses fourteen large tanks, nine of which are heated and thus appropriate for the storage of liquid asphalt. *Id.* Betteroads has a subsidiary, Betterecycling Corporation ("Betterecycling"), which generates revenue by leasing asphalt plants and selling liquid asphalt. *Id.* ¶ 6.

For decades, Betteroads and Betterecycling relied on Banco Popular de Puerto Rico ("Banco Popular") for banking services. *Id.* ¶ 11. Banco Popular was essential to their business, as they relied on multimillion-dollar lines of credit to purchase barges of liquid asphalt. *Id.*

At some point, the relationship with Banco Popular went south. The bank began denying Betteroads and Betterecycling access to capital to purchase barges of liquid asphalt. *Id.* ¶ 12. Banco Popular also began requiring Betteroads and Betterecycling to deposit all income into an operating account with the bank, and Banco Popular had to approve all payments made from that account. *Id.* In September 2016, Banco Popular seized Betteroads' and Betterecycling's operating accounts and demanded that all accounts receivables be paid directly to the bank. *Id.* ¶ 13. The bank also filed two collections actions against Betteroads and Bettercycling, though these were unsuccessful. *Id.* ¶ 14.

Given that their relationship with Banco Popular had soured, Betteroads and Betterecycling found themselves in a credit crunch. *Id.* ¶ 15. They required an alternate source of funding so they could continue purchasing liquid asphalt. *Id.* For this, they turned to Matcon Trading Corporation ("Matcon"), a Florida corporation. *Id.* ¶ 16.

Matcon, Betteroads, and Betterecycling reached an agreement that would facilitate their continued activity in the liquid asphalt business. *Id.* ¶¶ 15-16. Under the agreement, Matcon would obtain liquid asphalt, store it in Betteroads' asphalt terminal, and sell it to Betterecycling. *Id.* Matcon agreed to finance the liquid asphalt it sold to Betterecycling, and, in exchange, it would be able to use Betteroads' storage tanks on favorable terms and sell the liquid asphalt at a premium. *Id.* ¶ 16. The premium was the cost of financing. *Id.*

Based on this agreement, Matcon and Jesus Iglesias ("Iglesias") incorporated Bituven, a Matcon subsidiary in Puerto Rico that would enter a product throughput agreement with Betteroads.[2] *Id.* ¶¶ 17-18. Effective January 1, 2016, the throughput agreement granted Bituven the right to import and store in Betteroads' storage tanks some amount of liquid asphalt. *Id.* ¶ 18. The agreement guaranteed Betteroads and Betterecycling access to liquid asphalt despite their strained relationship with Banco Popular. *Id.* ¶ 19.

Bituven also entered a sales purchase agreement with Betterecycling, effective February 2016. *Id.* ¶ 27. Under that agreement, Bituven would sell Betterecycling liquid asphalt at a weekly price established by Poten & Partners ("Poten"), plus $40.00 per standard ton for transport.[3] *Id.* Bituven also granted Betterecycling a $1.2 million line of credit, with 60-day payment terms, subject to an additional payment of $0.30 per gallon, which was a financing fee. *Id.*

Matcon aimed to capitalize on its favorable agreement with Betteroads. *Id.* ¶ 20. To do so, it entered a joint venture with Asphaltos whereby Asphaltos and Bituven would work

---

[2] The counterclaim complaint does not explain who Iglesias is or why he was involved in this venture. Also involved were Iglesias's son, Julio Iglesias ("Iglesias Jr.") and Iglesias's son-in-law, Daniel El Harati ("El Harati"). *Id.* ¶ 18. The counterclaim complaint also fails to explain what role these individuals played in the liquid asphalt industry or why they were involved in business transactions between Bituven and Betteroads. However, I can glean from the counterclaim complaint that they appear to hold some authority over Matcon and Bituven. *See id.* ¶ 41 (explaining that Iglesias, Iglesias Jr., and El Harati directed Bituven and Matcon to send certain emails).

[3] Poten researches and analyzes international oil and shipping markets to establish weekly liquid asphalt reference prices. *Id.* ¶ 9. Industry participants can purchase a Poten membership subscription to gain access to those prices. *Id.*

Asphaltos Trade, S.A., v. Bituven Puerto Rico, LLC, Civil No. 18-1876 (BJM)                    5

together to send liquid asphalt to Betteroads' storage facility for later sale in Puerto Rico. *See id.* ¶¶ 20-24. From May 2016 to May 2017, the venture sent nine barges of liquid asphalt to dock at Betteroads' facility, depositing more than 42,000 metric tons of liquid asphalt in the tanks. *Id.* ¶ 22. Bituven would sell most of the asphalt to Betterecycling and some small quantities to PRA. *Id.* ¶ 26.

Meanwhile, Betterecycling's troubled relationship with Banco Popular continued. *Id.* ¶¶ 28-29, 33-34. Banco Popular remained in control of Betterecycling's operating account, and, on many occasions, it had refused to authorize payments, including some to Bituven. *Id.* ¶ 28. Eventually, Betterecycling defaulted on its payments to Bituven, owing Bituven $2.5 million. *Id.* ¶ 29.

Bituven, concerned that Betterecycling would seek bankruptcy protection and that it would never collect its $2.5 million, decided to take action. *Id.* ¶ 31. It proposed that, moving forward, rather than sell liquid asphalt to Betterecycling, it would sell directly to PRA. *Id.* Bituven and PRA agreed that Bituven would sell liquid asphalt to PRA on the same basic terms as Bituven had established with Betterecycling. *Id.* ¶ 32. However, PRA would not have a line of credit or a 60-day payment term, and PRA would have to pay off Betteroads' debt. *Id.* ¶¶ 30-32, 34, 37. Bituven continued selling liquid asphalt to PRA, representing that the prices reflected actual and contemporary Poten prices. *Id.* ¶ 35.

Unbeknownst to PRA, Bituven was overcharging it. *Id.* ¶¶ 36-37. In May 2016, Matcon, Bituven, Iglesias, Iglesias Jr., and El Harati had agreed to defraud PRA and Betterecycling. *Id.* ¶ 37. Under their plan, they would misrepresent the Poten liquid asphalt prices, shipping prices, and the payment PRA was making to pay down Betterecycling's debt. *Id.* They would artificially raise these costs, then invoice PRA via e-mail with a bundled sale price, making it difficult to detect that the price was inflated. *Id.* Included in the invoiced amount was a $0.30 per gallon fee to lower Betterecycling's debt, but PRA had already paid off that debt. *Id.*

Matcon staff, Bituven, Iglesias, Iglesias Jr., and El Harati sent PRA hundreds of e-mails with false invoices attached. *Id.* ¶ 36, 41, 62. Among these emails were those sent from Florida to Puerto Rico. *Id.* ¶ 40. Details on four of those emails follow:

(a) On May 19, 2017, at 5:01 pm, Matcon, Bituven, Mr. Iglesias, Mr. Iglesias Jr. and Mr. El Harati had Matcon staff sent [sic] PR Asphalt thirteen (13) invoices related to a number of sales of Liquid Ashalt [sic] from shipments LA9, LA10 and LA11, which charged PR Asphalt between $0.13 to $0.20 per gallon in excess of Poten & Partners prices with between $25-30 per ST in excess of shipping costs. Since the invoice prices were bundled, PR Asphalt did not notice the false charges and paid the invoices via wire transfer to Bituven's bank account in Banco Popular as instructed by the invoices. Those invoices summed to over $1,500,000.

(b) On June 5, 2017, at 10:40 am, Matcon, Bituven, Mr. Iglesias, Mr. Iglesias Jr. and Mr. El Harati had Matcon staff sent [sic] PR Asphalt two (2) invoices related to a number of sales of Liquid Asphalt from shipments LA11 and LA12, which charged PR Asphalt $0.20 per gallon in excess of Poten & Partners prices with between $25-30 per ST in excess of shipping costs. Since the invoice prices were bundled, PR Asphalt did not notice the false charges and paid the invoices via wire transfer to Bituven's bank account in Banco Popular as instructed by the invoices. Those invoices summed to over $300,000.00.

(c) On June 26, 2017, at 11:50 am, Matcon, Bituven, Mr. Iglesias, Mr. Iglesias Jr. and Mr. El Harati had Matcon staff sent [sic] PR Asphalt an invoice related to shipment LA11 and three (3) sales of Liquid Ashalt [sic], which charged PR Asphalt $.20 per gallon in excess of Poten & Partners prices with between $25-30 per ST in excess of shipping costs. Since the invoice prices were bundled, PR Asphalt did not notice the false charges and paid the invoices via wire transfer to Bituven's bank account in Banco Popular as instructed by the invoices. Those invoices summed to over $320,000.00.

(d) On August 29, 2018, at 4:08 pm, Mr. Iglesias Jr. sent PR Asphalt an invoice related to shipment LA12 demanding a $3.2 million dollar payment, which PR Asphalt did not own [sic]. Regarding shipment LA12, Bituven charged PR Asphalt $0.16 per gallon in excess of Poten & Partners prices with between $25-30 per ST in excess of shipping costs.

*Id.* ¶ 44. Via this scheme, Bituven overcharged PRA $1,360,852.54, which PRA paid. *Id.* ¶¶ 36, 38.

In July 2018, PRA's president secured a membership to access Poten's pricing services and discovered that Bituven had been overcharging. *Id.* ¶ 45. PRA asked Bituven to engage in a reconciliation process to address this situation. *Id.* ¶ 47. Bituven, Iglesias Jr.,

Asphaltos Trade, S.A., v. Bituven Puerto Rico, LLC, Civil No. 18-1876 (BJM)                    7

and El Harati refused to engage in any reconciliation, stating only that PRA owed Bituven $3,200,00.00. *Id.* ¶ 47.

At the same time PRA was demanding reconciliation related to overpayments, Asphaltos began suspecting that Bituven had defrauded it too. *Id.* ¶ 48. In the summer of 2018, Asphaltos discovered that some of its liquid asphalt, which had been stored at the Betteroads asphalt terminal, was missing. *Id.* Bituven had sold that liquid asphalt to PRA without disclosing this fact to Asphaltos. *Id.* ¶¶ 49-50. Rather than admitting that they had sold the asphalt to PRA, Bituven, Matcon, Iglesias Jr., and El Harati stated that PRA had removed the asphalt from the storage tanks without authorization. *Id.* ¶ 50. But Bituven knew that PRA had purchased and paid for the liquid asphalt. *Id.*

Essentially, to cover up their own unethical conduct, Bituven, Matcon, Iglesias, Iglesias Jr., and El Harati decided to cast blame on PRA. *Id.* ¶ 51. As part of its attempt to blame PRA for its own wrongdoing, Bituven filed two adversary proceeding complaints against PRA. *Id.* The second action was voluntarily dismissed so parties could negotiate a settlement and reconcile payments, but Bituven refused to engage in that process. *Id.* Further, Bituven filed a third-party complaint in the instant litigation only to justify its failure to meet its obligations toward Asphaltos. *Id.* ¶ 52.

PRA now seeks compensation from Bituven.

## DISCUSSION

Bituven seeks dismissal of PRA's claims for RICO violations, breach of contract, and abuse of process. I will address each claim in turn.

**(a) RICO**

Congress enacted RICO to support the federal government's "war against organized crime," *United States v. Turkette*, 452 U.S. 576, 587 (1981) and to combat "enduring criminal conduct," *Libertad v. Welch*, 53 F.3d 428, 445 (1st Cir. 1995). The statute authorizes both the criminal prosecution of RICO violators, *see* 18 U.S.C. § 1962, and creates "a generous private right of action—successful plaintiffs are entitled to triple

damages if they can prove they were 'injured in [their] business or property by reason of a violation of section 1962.'" *Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521, 527 (1st Cir. 2015) (quoting 18 U.S.C. § 1964(c)).

RICO liability breaks down to four essential elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). The statute includes numerous illegal acts in its definition of "racketeering activity." *Home Orthopedics*, 781 F.3d at 528 (citing 18 U.S.C. § 1961(1)). Among these is wire fraud, *id.*, which is the only form of racketeering activity PRA has alleged. "[T]o make out a civil claim under RICO by way of wire fraud, a plaintiff must allege that a group of defendants 'engaged in a scheme to defraud with the specific intent to defraud and that they used . . . the interstate wires in furtherance of the scheme.'" *Cordero-Hernandez v. Hernandez-Ballesteros*, 449 F.3d 240, 244 (1st Cir. 2006) (quoting *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 790 (1st Cir.1990) and citing *Ahmed v. Rosenblatt*, 118 F.3d 886, 888 (1st Cir. 1997)).

Of course, a single instance of wire fraud does not constitute a "pattern of racketeering activity." "A pattern of racketeering activity requires at least two predicate acts of racketeering within ten years of each other." *United States v. Rodriguez-Torres*, 939 F.3d 16, 29 (1st Cir. 2019). Additionally, the predicate acts must be related and "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The latter requirement means that a RICO plaintiff must show "continuity." *Home Orthopedics*, 781 F.3d at 528.

> [A] plaintiff can show continuity in one of two ways. Under the "closed" approach, a plaintiff would have to prove a "closed period of repeated conduct" that "amounted to . . . continued criminal activity." Alternatively, under the "open-ended" approach, a plaintiff could satisfy the continuity requirement by showing "past conduct that by its nature projects into the future with a threat of repetition."

*Id.* (quoting *H.J. Inc.*, 492 U.S. at 237, 241).

Additionally, where a RICO claim is based on wire fraud, the plaintiff must comply with the pleading standards of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). *Feinstein v. ADR Tr. Corp.*, 942 F.2d 34, 42 (1st Cir. 1991). Rule 9(b) creates a heightened pleading standard for allegations of fraud, under which "a party must state with particularity the circumstances constituting fraud or mistake," though the elements of "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." "As in any other fraud case, the pleader is required 'to go beyond a showing of fraud and state the time, place and content of the alleged mail and wire communications perpetrating that fraud.'" *Id.* (quoting *New England Data Services, Inc. v. Becher*, 829 F.2d 286, 291 (1st Cir. 1987); *see also Vazquez-Baldonado v. Domenech*, 792 F. Supp. 2d 218, 222 (D.P.R. 2011) ("Plaintiff must plead with particularity when and where the wire communications took place, in addition to what information was exchanged."). "The purpose of Rule 9(b)'s particularity requirement are threefold; (1) to place defendants on notice and allow them to prepare a meaningful response, (2) to preclude the use of groundless fraud claims as pretext for discovery or 'strike suits,' and (3) to safeguard defendants from the reputation damage of frivolous charges." *Efron v. Embassy Suites (Puerto Rico), Inc.*, 47 F. Supp. 2d 200, 204 (D.P.R. 1999), *aff'd*, 223 F.3d 12 (1st Cir. 2000) (citing *Becher*, 829 F.2d at 289).

Bituven argues (1) that PRA failed to plead fraud with the requisite particularity and (2) that its allegations do not show a pattern of racketeering activity. Regarding the particularity of the allegations, PRA alleged that it fell victim to Bituven's fraudulent scheme, which was carried out by e-mail. Bituven and PRA agreed that Bituven would sell PRA liquid asphalt at the weekly Poten price, plus $40.00 per standard ton for transport, plus a regular payment to pay down Betterecycling's debt. *See* Countercl. Compl. ¶¶ 27, 32, 34. But Bituven had secretly plotted with others to misrepresent the Poten liquid asphalt prices, shipping prices, and the payment due toward Betterecycling's debt. *Id.* ¶ 37. They would artificially raise these costs, then invoice PRA via e-mail with a bundled sale price.

Asphaltos Trade, S.A., v. Bituven Puerto Rico, LLC, Civil No. 18-1876 (BJM)                     10

*Id.* That bundled price included ongoing fees to lower Betterecycling's debt, even after PRA had paid it off. *Id.* As part of this scheme, Bituven and others sent PRA hundreds of e-mails with false invoices attached. *Id.* ¶¶ 36, 41, 62.

To the extent PRA challenges the "hundreds of emails" seeking payment for liquid asphalt, it fails to comply with Rule 9(b)'s pleading requirements. Although the counterclaim complaint permits a conclusion that these emails must have been sent between May 2016 and August 2018 and that many of them were sent from Florida to Puerto Rico, the details related to these "hundreds of emails" are still far too spartan to satisfy Rule 9(b). PRA does not explain when exactly these emails were sent or who specifically sent them, leaving Bituven to guess which of its emails to PRA might be challenged as predicate acts of wire fraud. *See Giuliano v. Fulton*, 399 F.3d 381, 388 (1st Cir. 2005) (where plaintiff alleged that defendant communicated with co-conspirators "on multiple occasions on and after December of 1999 . . . by mail, telephone and interstate wire transmission," plaintiff's vague allegations did not satisfy Rule 9(b)). And because the e-mails are presumably within PRA's possession, PRA could have provided specific details regarding which emails it believes are fraudulent, when they were sent, and by whom. *See Tierney and Partners*, *Inc. v. Rockman*, 274 F. Supp. 2d 693, 698–99 (E.D. Pa. 2003) ("If Plaintiff alleges that the faxing of fraudulent invoices by various Defendants, on various occasions, amounts to a pattern of racketeering activity, Plaintiff must identify each separate predicate act, of which Plaintiff has knowledge, indicating the date, the particular person or entity who sent the facsimile in question, the recipient, and, most importantly, the way in which the particular transmission furthered the pattern of racketeering activity and the overall fraudulent scheme.").

But PRA does not rest its entire claim on a reference to "hundreds of emails." Rather, it also provides four specific examples of allegedly fraudulent e-mails:

(a) On May 19, 2017, at 5:01 pm, Matcon, Bituven, Mr. Iglesias, Mr. Iglesias Jr. and Mr. El Harati had Matcon staff sent [sic] PR Asphalt thirteen (13) invoices related to a number of sales of Liquid Ashalt from shipments LA9, LA10 and LA11, which

   charged PR Asphalt between $0.13 to $0.20 per gallon in excess of *Poten & Partners* prices with between $25-30 per ST in excess of shipping costs. Since the invoice prices were bundled, PR Asphalt did not notice the false charges and paid the invoices *via* wire transfer to Bituven's bank account in Banco Popular as instructed by the invoices. Those invoices summed to over $1,500,000.

(b) On June 5, 2017, at 10:40 am, Matcon, Bituven, Mr. Iglesias, Mr. Iglesias Jr. and Mr. El Harati had Matcon staff sent [sic] PR Asphalt two (2) invoices related to a number of sales of Liquid Asphalt from shipments LA11 and LA12, which charged PR Asphalt $0.20 per gallon in excess of *Poten & Partners* prices with between $25-30 per ST in excess of shipping costs. Since the invoice prices were bundled, PR Asphalt did not notice the false charges and paid the invoices *via* wire transfer to Bituven's bank account in Banco Popular as instructed by the invoices. Those invoices summed to over $300,000.00.

(c) On June 26, 2017, at 11:50 am, Matcon, Bituven, Mr. Iglesias, Mr. Iglesias Jr. and Mr. El Harati had Matcon staff sent [sic] PR Asphalt an invoice related to shipment LA11 and three (3) sales of Liquid Ashalt [sic], which charged PR Asphalt $.20 per gallon in excess of *Poten & Partners* prices with between $25-30 per ST in excess of shipping costs. Since the invoice prices were bundled, PR Asphalt did not notice the false charges and paid the invoices *via* wire transfer to Bituven's bank account in Banco Popular as instructed by the invoices. Those invoices summed to over $320,000.00.

(d) On August 29, 2018, at 4:08 pm, Mr. Iglesias Jr. sent PR Asphalt an invoice related to shipment LA12 demanding a $3.2 million dollar payment, which PR Asphalt did not own [sic]. Regarding shipment LA12, Bituven charged PR Asphalt $0.16 per gallon in excess of *Poten & Partners* prices with between $25-30 per ST in excess of shipping costs.

Countercl. Compl. ¶ 44. Here, PRA provides more specific details regarding the time and date of the email transmissions, the content of each transmission, and the identities of those responsible for sending the invoices. With respect to these four emails, PRA has provided sufficient information regarding the time, place, and content of the wire communications to place Bituven on notice of the fraud with which it is charged and permit it to prepare a meaningful response.

   Nonetheless, Bituven contends that PRA's allegations related to these four emails are insufficient because they fail to state that these specific communications traveled interstate, which is an essential element of the federal wire fraud. *See Efron*, 47 F.Supp.2d at 205 (citing *Bernstein v. Misk*, 948 F.Supp. 228 (E.D.N.Y. 1997)). But PRA does allege

that many e-mails were sent from Florida to Puerto Rico. Countercl. Compl. ¶ 44. And if that were too vague to tie the specifically pleaded emails to interstate wires, discovery on this question rather than dismissal of the RICO claim would be appropriate because the location from which the emails were sent is information "likely in the exclusive control of [Bituven]." *Becher*, 829 F.2d at 290.

Of course, discovery on this question would only be appropriate if PRA has otherwise stated a RICO claim. Accordingly, I turn to Bituven's next argument: that PRA has failed to allege a pattern of racketeering activity.

To show that Bituven's alleged racketeering activities constituted a pattern, PRA must satisfy the continuity requirement. It may do so "by demonstrating either closed-ended continuity, which refers to 'a closed period of repeated conduct,' or open-ended continuity, which encompasses 'past conduct that by its nature projects into the future with a threat of repetition.'" *United States. v. Cadden*, 965 F.3d 1, 15–16 (1st Cir. 2020) (quoting *H.J.*, 492 U.S. at 241).

"[A] closed-ended pattern sometimes can be established by examining only the number of alleged predicate acts and the duration of the alleged racketeering activity." *Giuliano*, 399 F.3d at 387. In examining the number of predicate acts, the court considers "only those predicate acts specifically alleged" in the complaint, *Efron*, 223 F.3d at 16. Although there is no bright-line rule requiring a certain number of predicate acts over a specified period to show a pattern, "sporadic activity" or acts spanning only a "few weeks or months," cannot establish closed continuity. *H.J.*, 492 U.S. at 239; *Home Orthopedics*, 781 F.3d at 529. On the other hand, "where the temporal duration of the alleged activity and the alleged number of predicate acts are so extensive that common sense compels a conclusion of continuity, closed-ended continuity should be found." *Giuliano*, 399 F.3d at 387 (citation and quotations omitted).

Where the alleged activity is beyond sporadic but not clearly continuous, courts "look to 'indicia of continuity.'" *Home Orthopedics*, 781 F.3d at 529 (quoting *Giuliano*,

399 F.3d at 387). Relevant factors include "whether the defendants were involved in multiple schemes, as opposed to 'one scheme with a singular objective'; whether the scheme affected many people, or only a 'closed group of targeted victims'; and whether the scheme had the potential to last indefinitely, instead of having a 'finite nature.'" *Id.* (quoting *Efron*, 223 F.3d at 18–19). Ultimately, however, courts take a "natural and commonsense approach . . . to determine whether the specific fact pattern . . . suggests the kind of broad or ongoing criminal behavior at which the RICO statute was aimed." *Id.* (internal citations and quotation marks omitted).

Here, PRA has alleged that Bituven engaged in four predicate acts of wire fraud to obtain money to which it was not entitled. The first three alleged acts of wire fraud occurred over the course of about one month—from May 19 to June 26, 2017. The final act occurred just over a year later—on August 29, 2018. So few acts committed over such a brief period run the risk of constituting nothing more than "sporadic activity." *H.J. Inc.*, 492 U.S. at 239. But even if this is one of the "squishier" cases, *Home Orthopedics*, 781 F.3d at 529, I find that PRA has not alleged a pattern of racketeering activity based on closed-ended continuity.

Based on PRA's allegations, Bituven was engaged in a limited scheme to trick PRA into overpaying for liquid asphalt. PRA gestures toward other alleged fraud in an effort to make this scheme look more expansive, but does so without reference to RICO. For instance, at one point in its counterclaim complaint, PRA states that Bituven and others "had agreed, since May of the year 2016, to engage in a scheme to defraud Betterecycling and PR Asphalt" by inflating various prices. Counterclaim Compl. ¶ 37. PRA does not elaborate, however, on how Bituven defrauded Betterecycling specifically, nor does PRA suggest that any fraud aimed at Betterecycling constituted mail or wire fraud or any other form of racketeering activity. But mere common law fraud is not racketeering activity under RICO. *See Giuliano*, 399 F.3d at 388. Thus, PRA's brief reference to the defrauding of Betterecycling cannot form part of any pattern of racketeering activity. *Efron v. Embassy*

*Suites (Puerto Rico), Inc.*, 223 F.3d 12, 16 (1st Cir. 2000) ("[W]e consider only those predicate acts specifically alleged in evaluating the adequacy of appellant's "pattern" allegations."). Similarly, PRA points to Bituven's conduct toward Asphaltos to intimate that Bituven must have been engaged in a broad scheme to swindle various business associates. PRA alleges that Bituven was selling Asphaltos' liquid asphalt without permission and without paying Asphaltos and that, when confronted, Bituven lied, blaming PRA for Bituven's wrongdoing. Countercl. Compl. ¶¶ 48-52. Again, PRA does not explain how this alleged conduct, although reprehensible, constitutes racketeering activity. What PRA has alleged, then, is a few acts of wire fraud targeted narrowly at PRA. But courts "consistently decline[] to find continuity where the RICO claim concerns a single, narrow scheme targeting few victims." *Giuliano*, 399 F.3d at 390.

Further, the alleged scheme is unlikely to extend to anyone beyond PRA. Bituven could only carry out the alleged scheme because PRA did not have a Poten subscription, despite participating in the liquid asphalt industry, and because it was paying down Betterecycling's debt. Theoretically, Bituven might be able to find another liquid asphalt buyer who declines to check the Poten reference prices, but, at least with regard to the alleged wire fraud related to Betterecycling's debt, PRA was singularly positioned.

First Circuit "precedent firmly rejects RICO liability where the alleged racketeering acts . . ., taken together, . . . comprise a single effort to facilitate a single financial endeavor." *Efron*, 223 F.3d at 19 (quoting *Schultz v. R.I. Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 732 (1st Cir.1996)) (quotations omitted). Yet PRA has accused Bituven of engaging in a single financial endeavor: repeatedly lying about the prices on which PRA and Bituven had originally agreed so as to dupe PRA into overpaying. *See Apparel Art Int'l, Inc. v. Jacobson*, 967 F.2d 720, 723 (1st Cir.1992) (holding that "several instances of criminal behavior," including making bribes and false statements, were "appropriately characterized as separate parts of a single criminal episode" because they "comprise[d] a single effort to obtain (and to keep) one . . . contract"). In sum, PRA has alleged a handful of predicate

Asphaltos Trade, S.A., v. Bituven Puerto Rico, LLC, Civil No. 18-1876 (BJM)                                    15

acts, narrowly targeted at a single victim, barely spanning one year, and concentrated primarily over one month. These facts do not amount to closed-ended continuity. *See Giuliano*, 399 F.3d at 390 ("Our case law suggests that the commission of 16 predicate acts over a six-month period is inadequate to establish a closed-ended pattern of racketeering activity."); *Efron*, 223 F.3d at 18-19 (seventeen predicate acts carried out over 21 months as part of a single scheme targeting three victims could not support a RICO pattern under the closed continuity approach).

"[E]ven in the absence of closed continuity, a plaintiff can still demonstrate a 'pattern' by showing a 'threat of' future criminal activity—that is, 'a realistic prospect of continuity over an open-ended period yet to come.'" *Home Orthopedics*, 781 F.3d at 531 (quoting *Feinstein*, 942 F.2d at 45). "This approach necessitates a showing that the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business." *Id.*

PRA argues that it has alleged open-ended continuity because Bituven continues to demand overpayment for liquid asphalt. Specifically, Bituven has filed a third-party complaint in the instant litigation seeking $3.4 million and treble damages even though PRA has already paid for the asphalt. Dkt. 104 at 9. But this argument misapprehends the law of open-ended continuity. PRA cannot establish a threat of continued criminal activity for purposes of RICO merely by demonstrating that Bituven is engaged in ongoing fraud or that it regularly conducts its business by means of deception. *See Fleet Credit Corp. v. Sion*, 893 F.2d 441, 448 (1st Cir. 1990). Rather, PRA "must demonstrate that the predicate acts—here the acts of [wire] fraud—were a regular way of conducting the ongoing businesses." *Id.* PRA, however, has not explained why the acts of *wire fraud*, or other forms of *racketeering activity*, pose a specific threat of repetition or are part of Bituven's regular way of doing business outside the handful of acts alleged in the counterclaim complaint.

I also note that PRA's RICO claim is based solely on wire fraud. "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease

Asphaltos Trade, S.A., v. Bituven Puerto Rico, LLC, Civil No. 18-1876 (BJM) 16

with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Efron,* 223 F.3d at 20. Indeed,

> [v]irtually every garden-variety fraud is accomplished through a series of wire or mail fraud acts that are "related" by purpose and spread over a period of at least several months. Where such a fraudulent scheme inflicts or threatens only a single injury, we continue to doubt that Congress intended to make the availability of treble damages and augmented criminal sanctions [under RICO] dependent solely on whether the fraudulent scheme is well enough conceived to enjoy prompt success or requires pursuit for an extended period of time. Given its "natural and common sense approach to RICO's pattern element," we think it unlikely that Congress intended RICO to apply in the absence of a more significant societal threat.

*U.S. Textiles, Inc. v. Anheuser–Busch Cos.*, 911 F.2d 1261, 1268 (7th Cir.1990) (quoting *Marshall–Silver Constr. Co. v. Mendel*, 894 F.2d 593, 597 (3d Cir.1990)); *see also Al–Abood ex rel. Al–Abood v. El–Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) ("[I]t will be the unusual fraud that does not enlist the mails and wires in its service at least twice.") (internal quotation marks and citations omitted); *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989) ("Congress contemplated that only a party engaging in widespread fraud would be subject to such serious consequences. . . . The pattern requirement . . . ensure[s] that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value...."). PRA alleges a few instances of wire fraud aimed at a single victim as part of a discrete overcharge scheme with a narrow purpose, and it has not explained why those instances of wire fraud should be expected to continue. Common sense suggests that this is not "the kind of broad or ongoing criminal behavior at which the RICO statute was aimed." *Efron.*, 223 F.3d at 18; *see also Tellis v. U.S. Fidelity & Guaranty Co.*, 826 F.2d 477, 478 (7th Cir. 1986) ("[M]ultiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction cannot constitute the necessary pattern.").

Asphaltos Trade, S.A., v. Bituven Puerto Rico, LLC, Civil No. 18-1876 (BJM)                                                                 17

Because PRA has failed to allege a pattern of racketeering activity, its RICO claims are dismissed. This includes PRA's RICO conspiracy claim because, "if the pleadings do not state a substantive RICO claim upon which relief may be granted, then the conspiracy claim also fails." *Efron*, 223 F.3d at 21.

**(b) Breach of Contract**

"Under Puerto Rico law, a claim for breach of contract has three elements: (1) a valid contract; (2) a breach by one of the parties to the contract; and (3) resulting damages." *Yacht Caribbean Corp. v. Carver Yacht LLC*, 270 F. Supp. 3d 547, 555 (D.P.R. 2017). "Puerto Rico law makes clear that contracts shall be binding, regardless of the form in which they were executed, 'provided the essential conditions required for their validity exist.'" *Markel American Ins. Co. v. Díaz-Santiago*, 674 F.3d 21, 31 (1st Cir. 2012) (citing 31 L.P.R.A. § 3451).

PRA alleges that it and Bituven entered an agreement whereby Bituven would sell PRA liquid asphalt on the same basic terms as Bituven had established with Betterecycling. *Id.* ¶ 32. Under those terms, Bituven was selling Betterecycling liquid asphalt at the weekly Poten price, plus $40.00 per standard ton for transport, plus an additional payment of $0.30 per gallon, which was a financing fee. *Id.* ¶ 27. The difference between Bituven's agreement with Betterecycling and Bituven's agreement with PRA was that PRA would not have a line of credit or 60-day payment term, and PRA would have to pay off Betteroads' debt. *Id.* ¶¶ 30-32, 34, 37. These allegations are sufficient at this stage to show a valid contract.

PRA also alleges that, rather than sell the liquid asphalt at the agreed upon price, Bituven was secretly overcharging for the Poten price and the shipping fee, as well as continuing to charge PRA to pay down Betteroads' debt, even after that debt was paid off. *Id.* ¶ 37. These allegations are sufficient at this stage to allege breach.

Finally, PRA alleges that it paid Bituven's fraudulent invoices, overpaying by $1,360,852.54. *Id.* ¶¶ 36, 38. It has thus pleaded resulting damages.

Bituven nonetheless takes issues with various pieces of PRA's breach of contract claim. First, Bituven contends that, according to PRA's counterclaim complaint, PRA and Bituven never in fact agreed that the sale price would be the Poten price; rather, the sale price was the Poten price plus a premium of $0.30 per gallon, which was part of the original deal with Betterecycling. Dkt. 91 at 16. Next, Bituven argues that, according to the specific examples of invoiced amounts offered in the counterclaim complaint, Bituven only ever charged PRA between $0.13 and $0.20 per gallon above the Poten price, which would place Bituven well within the agreement to charge the Poten price plus $0.30 per gallon. Finally, Bituven argues that PRA never alleged paying the August 29 invoice, which means, if that invoice constituted a breach, there were no resulting damages.

None of these arguments merits dismissal at this stage. In essence, all of Bituven's arguments ask that I parse through the counterclaim complaint to view the facts in a light more favorable to Bituven than to PRA. Such an approach is inappropriate on a Rule 12(b)(6) motion to dismiss. Bituven is free to contest the terms of any agreement, the specific nature of any breach, and the extent of damages at later stages of the litigation. However, at this stage, the facts alleged in the counterclaim complaint, taken in the light most favorable to PRA, state a claim for breach of contract.

**(c) Abuse of Process**

Finally, Bituven argues that PRA has failed to state a claim for malicious prosecution or, in the alternative, abuse of process. Dkt. 91 at 17 and 18 n.9. Because PRA defends its claim only as one for abuse of process, Dkt. 104 at 12, I treat it as such.

To establish abuse of process, PRA must show (1) that Bituven possessed a bad motive and (2) that Bituven employed the legal process for an improper, collateral objective. *González–Rucci v. United States INS*, 539 F.3d 66, 71 (1st Cir. 2008). "In contrast to malicious prosecution claims, which are generally directed to a legal action as a whole, abuse of process claims typically cover[ ] challenges to the legal action's procedural components, such as subpoenas or discovery mechanisms." *Id.* (internal quotation marks

and citations omitted); *see also Nogueras–Cartagena v. United States*, 172 F.Supp.2d 296, 316 (D.P.R. 2001) ("[M]alicious prosecution is used to challenge the whole of a lawsuit while abuse of process covers the allegedly improper use of legal procedures after a suit has been filed properly.") (internal citation omitted).

PRA alleges that Bituven filed three lawsuits against it, including the instant suit, to cover up its own bad acts. Thus, the only "process" involved in PRA's abuse of process claim is this initiation of three lawsuits. However, as the First Circuit has explained, the "[f]iling of a lawsuit is a regular use of process, and therefore, may not on its own fulfill the requirement of an abusive act, even if the decision to sue was influenced by a wrongful motive, purpose or intent." *Simon v. Navon*, 71 F.3d 9, 16 (1st Cir. 1995) (citing cases) (holding that "a showing of bad motive in connection with 'regular' process is not enough" to sustain an abuse of process claim). Because PRA has not identified an abusive act, such as an improper subpoena or discovery request, it has not stated a claim for abuse of process. *See Dish Network LLC v. Llinas*, 310 F. Supp. 3d 310, 312–13 (D.P.R. 2018).

Accordingly, PRA's fourth cause of action is dismissed.

## CONCLUSION

For the foregoing reasons, PRA's RICO and abuse of process claims are dismissed, but its breach of contract claim survives. Counterclaim defendant's motion to dismiss is **GRANTED IN PART**.

**IT IS SO ORDERED.**
In San Juan, Puerto Rico, this 16th day of February 2021.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge